# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Derrick Scott, | Civ. No. 09-3170 (ADM/JJK) |
| Plaintiff, | |
| v. | |
| M. Chastain; Fernando Castillo; David Szoke; B. A. Bledsoe; Lisa Hollingsworth; Brian Joe Davis; Mr. Kenneth Sample; James Edmond, also known as Jim Edmond; Dr. Paul Harvey; Tom Nelson; Scott Fisher; Lanett Ritter; and William Bill Earl; | **REPORT AND RECOMMENDATION** |
| Defendants. | |

Derrick Scott, 26724044, Federal Correctional Institution, Post Office Box 1000, Sandstone, MN 55072, *pro se*.

David W. Fuller, Esq., Assistant United States Attorney, counsel for Defendants.

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODUCTION

This matter is before this Court on Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. No. 12). This Court issues the following Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons set forth below, this Court recommends that Defendants' motion be granted and Plaintiff's First Amended Complaint be dismissed.

**BACKGROUND**

Plaintiff brings this action pursuant to *Bivens v. Six Unknown Named*

*Agents of the Fed. Bur. of Narcotics*, 403 U.S. 388 (1971),[1] seeking injunctive

and monetary relief. (Doc. No. 27, First Am. Compl. ("FAC") ¶ V.)[2] Plaintiff is a

federal inmate who is currently confined in the Federal Correctional Institution in

---

[1]      Because Defendants are federal, and not state, employees, to the extent
Plaintiff asserts claims under 42 U.S.C. § 1983, this Court construes the
pleadings liberally as a *Bivens* action.

[2]      After Defendants filed their motion, Plaintiff interposed the First Amended
Complaint (Doc. No. 27). Defendants have not objected to the filing of the First
Amended Complaint. (Doc. No. 37, Defs.' Reply Mem. in Supp. of Defs.' Mot. to
Dismiss or, in the Alternative, for Summ. J. ("Defs.' Reply") 1 n.1.) Indeed,
because no "responsive pleading" had been filed as provided in Rule 15(a)(1)(A),
Plaintiff was able to amend his Complaint as a matter of course. *See* 6 Charles
A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1483 at 484-85
(2d Ed. 1990) ("[C]ertain motions may be made before interposing a responsive
pleading. Indeed, a motion involving any of the Rule 12(b) defenses normally
must be made before serving a responsive pleading [and, thus,] courts have held
that the filing of a motion to dismiss will not prevent a party from subsequently
amending without leave of court."). Nevertheless, Defendants argue that the
filing of the First Amended Complaint did not cure the deficiencies they allege
existed in the initial Complaint. (Defs.' Reply 1 n.1.) Thus, in considering the
current motion for dismissal or summary judgment, this Court will address the
claims in Plaintiff's First Amended Complaint. *See id.* § 1476 at 558
("[D]efendants should not be required to file a new motion to dismiss simply
because an amended pleading was introduced while their motion was pending."below).
This Court also notes, however, that the forty-five separate paragraphs in the
First Amended Complaint setting forth the factual substance of Plaintiff's claims
are identical to the forty-five paragraphs comprising the substance in the initial
Complaint. Plaintiff has identified the legal basis for his claims in the First
Amended Complaint as the Eight Amendment's Cruel and Unusual Punishments
clause and a claim for "Medical Deliberate Indifference." (*Compare* Doc. No. 1,
Compl. at 3 ¶ IV, *with* FAC at 3 ¶ 4.) In his amended pleading, Plaintiff also
specifies that several Defendants are "being sued in their individual capacities[.]"
(FAC at 4.)

Sandstone, Minnesota ("FCI-Sandstone").  (*Id.* ¶ III.A.)  Prior to his confinement

at FCI-Sandstone, Plaintiff was confined at the United States Penitentiary in

Marion, Illinois ("USP-Marion").  (Doc. No. 23, Decl. of Ann C. Kinyon ("Kinyon

Decl.") ¶ 2.)  In general, Plaintiff's claims arise out of Defendants' allegedly

inadequate treatment of his medical needs while he was incarcerated at both

facilities.

　　　Plaintiff alleges that before August 21, 2007, he began experiencing

"injuries" caused by the mattress on his bed.  (FAC at 4, ¶ IV.1.)  He complained

about these injuries to Defendant M. Chastain, the Health Care Administrator at

USP-Marion, by filing forms discussing the nature of his concerns.  (*See id.* at 4-

5, ¶¶ IV.1-2.)  On August 25, 2007, Plaintiff filed an Informal Resolution Form

concerning his mattress with his correctional counselor, but he did not receive a

"better sleeping mattress" in response.  (*Id.* at 5, ¶¶ IV.3-4; Kinyon Decl ¶ 3,

Attach. 2 at 7.)  Thereafter, Plaintiff sought relief from the USP-Marion Warden,

Defendant B.A. Bledsoe, who upheld Chastain's decision not to provide Plaintiff

with a new mattress.  (FAC at 5, ¶¶ IV.6-7.)  Plaintiff's subsequent appeals to the

regional office and to the Federal Bureau of Prisons Director at the Central Office

were denied.  (*Id.* ¶¶ IV.8-9.)  And on January 15, 2008, the Administrator for

National Inmate Appeals also denied Plaintiff's requests for a new mattress.

(Kinyon Decl. ¶ 3, Attach. 2 at 13.)

　　　On January 8, 2008, Plaintiff complained to USP-Marion Associate

Wardens "Zeller and Zych" that he was experiencing pain and suffering.  (FAC at

6, ¶ IV.11.)  Specifically, Plaintiff complained that after he was examined by

Defendant Dr. David Szoke, Dr. Szoke "promised an X-ray but [Plaintiff] hadn't

received it" for more than two months after the examination.  (*Id.*)  On January

24, 2008, Plaintiff's lower spine and right hip were X-rayed and the X-ray

revealed a osteochondroma[3] in Plaintiff's right hip.  (*Id.* ¶ IV.12.)  A CT scan of

Plaintiff's right hip performed a few weeks later also showed exostosis and

osteochondroma.  (*Id.* ¶ IV.13.)  On August 12, 2008, several months after the

CT scan, Plaintiff filed an Inmate Request to Staff form with a USP-Marion

Associate Warden because Plaintiff was experiencing great pain and Dr. Szoke

had allegedly informed Plaintiff that "there [was] nothing he [could] do for him."

(*Id.* ¶ IV.14.)  According to Plaintiff, Dr. Szoke did nothing for Plaintiff's pain after

the associate warden forwarded the inmate-request form.  (*Id.* ¶ IV.15.)  Plaintiff

also filed a Request for an Administrative Remedy about Dr. Szoke's alleged

refusal to help relieve Plaintiff's right-hip pain, and he requested a "medical

solution" for the problem, such as the services of a chiropractor.  (Kinyon Decl.

¶ 2, Attach. 2 at 17.)  Apparently, this matter was informally resolved via a

referral.  (*See id.* (handwritten comments in Part B).)

---

3       Osteochondroma is "[a] benign cartilagionous neoplasm that consists of a
pedicle of normal bone (protruding from the cortex) covered with a rim of
proliferating cartilage cells; may originate from any bone that is preformed in
cartilage but is most frequent near the ends of long bones[.]"  Thomas L.
Stedman, *Stedman's Medical Dictionary* 1389 (28th ed. 2006).

On July 31, 2008, Defendant Fernando Castillo examined Plaintiff for hemorrhoid problems, and Plaintiff received an ointment and suppositories following the examination. (FAC at 6, ¶ IV.16.) Plaintiff alleges that this medication caused serious side effects. (*Id.* at 7, ¶ IV.17.) Plaintiff alleges that Leslee Duncan examined him and prescribed medication to treat Plaintiff's complications. (*Id.* ¶ IV.18.) According to Plaintiff, the underlying hemorrhoid problem was caused by Defendant Brian Joe Davis forcing Plaintiff to sit on a hard plastic chair for thirty hours each week in his job. (*Id.* ¶¶ IV.19-20.) On August 2, 2008, Plaintiff filed a complaint form with his Correctional Counselor asserting that the hard plastic chairs at his job exacerbated his hemorrhoid condition, and Plaintiff requested that he be provided with a "better sitting chair." (Kinyon Decl. ¶ 3, Attach. 2 at 14.) Plaintiff was not satisfied with the resolution from this informal-request process, so he filed a request for an administrative remedy, again asking for a more comfortable sitting chair. But this request was also denied. (*Id.* at 15-16.)

In October 2008, Plaintiff was transferred from USP-Marion to FCI-Sandstone, and medical staff at FCI-Sandstone "did a health care screen on the Plaintiff." (FAC at 7, ¶ IV.22; Kinyon Decl. ¶ 2, Attach 1 at 2.) Shortly after his transfer, Registered Nurse Steven Vavrosky prescribed plaintiff medication for his hemorrhoids similar to that prescribed months earlier at USP-Marion by Defendant Castillo. (FAC at 7, ¶ IV. 24.) Nurse Vavrosky also noted that Plaintiff claimed to have right-hip pain caused by a benign cyst. (Doc. No. 30, Aff. in

Supp. of Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. ("Pl.'s Aff."), Attach. 1 at 7.)  Defendant James Edmond, a mid-level practitioner, noted the treatment Plaintiff previously received for his hemorrhoid condition, and also noted that he would refer Plaintiff to a visiting medical doctor related to the osteochondroma of Plaintiff's right femur.  (*Id.*, Attach. 1 at 8.)  On January 21, 2009, Plaintiff received another right-hip X-ray that revealed osteochondroma.  (FAC at 8, ¶¶ IV.25-28.)  The reviewing radiologist, Dr. Michael Momont, recommended "repeat imaging of the right femur in approximately six months to follow the bony lesion for any change," but he did not feel that the osteochondroma was Plaintiff's "current pain generator." (Pl.'s Aff., Attach. 3 at 7.)

Shortly after this X-ray, Plaintiff asserts that Defendant "Lieutenant William Bill Earl moved the Plaintiff to a broken bed with iron bars poking against the Osteochondroma that influenced the pain dramatically."  (FAC at 8 ¶ IV.29.)[4]  On

---

[4]    Attached to Plaintiff's affidavit opposing Defendants' motion, is a document entitled "Motion for Temporary Injunctive Relief" and captioned Derrick Scott v. William Bill Earl.  (Pl.'s Aff., Attach. 5.)  In it, Plaintiff accuses Defendant Earl of constantly harassing and retaliating against him by transferring him to a broken bed.  (*Id.* at 1.)  Plaintiff also states that Defendant Earl accused Plaintiff of looking at him, threatened to have Plaintiff fired, made derogatory remarks to Plaintiff while Plaintiff was working, yelled at Plaintiff, and made racial slurs toward Plaintiff.  (*Id.* at 1-2.)  Only the allegation regarding being moved to a different bed appears anywhere in the First Amended Complaint, and Plaintiff has not actually filed any motion in this action seeking a temporary injunction. Further, beyond the allegations in his self-styled motion for temporary injunctive relief, Plaintiff has provided no factual support on which this Court could award injunctive relief.

February 4, 2009, Plaintiff complained to Defendant Linette Ritter, FCI-Sandstone Associate Warden, that his Correctional Counselor, an individual identified as "Stadain," was denying Plaintiff the right to address the bed issue through the grievance process. (*Id.* ¶ IV.30.) Thereafter, Plaintiff filed an Inmate Request to Staff form with Defendant Kenneth Sample, FCI-Sandstone's Health Care Administrator. (*Id.* ¶ IV.31.) But, according to Plaintiff, Defendant Sample ignored the request form until Plaintiff began to file further paperwork. (*Id.* ¶ IV.32.)

On March 2, 2009, Plaintiff filed a request for an administrative remedy. (FAC at 8, ¶ IV.32; Kinyon Decl. ¶ 3, Attach. 2 at 18.) According to Plaintiff, Defendant Sample was denying him access to his medical records and providing false information about Plaintiff's medical treatment at FCI-Sandstone. (FAC at 9, ¶ IV.35; Kinyon Decl. ¶ 3, Attach. 2 at 19.) Defendant Ritter responded that Plaintiff had not requested a remedy and that the documentation Plaintiff provided did not support his allegation that Defendant Sample was spreading false information. (Kinyon Decl. ¶ 3, Attach. 2 at 20.) Plaintiff appealed this decision to the Bureau of Prisons Regional Director, asking that his illness be cured and that Sample be sanctioned, but the Regional Director upheld Ritter's decision and noted that Plaintiff had "consistently been provided timely and appropriate medical care[.]" (FAC at 9, ¶ IV.37; Kinyon Decl. ¶ 3, Attach. 2 at 21-22.) On June 7, 2009, Plaintiff further appealed to the Central Office, this time raising issues with FCI-Sandstone's alleged refusal to allow him to review his

medical records; this appeal was also rejected.  (FAC at 9, ¶ IV.39; Kinyon Decl. ¶ 3, Attach. 2 at 23-24.)

On May 22, 2009, Dr. Tom Nelson, a contract surgeon for FCI-Sandstone, examined Plaintiff for hemorrhoids, and, according to Plaintiff, contrary to the findings of "all the other medical staff[,] . . . Nelson stated that the Plaintiff doesn't have hemorrhoids."  (FAC at 10, ¶ IV.45.)

Plaintiff next alleges that a May 28, 2009 bone scan of his right hip revealed osteochondroma of his right femur.  (FAC at 9, ¶ IV.38.)  Plaintiff again filed informal grievances with members of the FCI-Sandstone administration, including Defendants Scott Fisher and Sample, regarding Plaintiff's right-hip pain.  (*Id.* ¶¶ IV.40-42.)  He also filed an Inmate Request to Staff form with Defendant Edmond, again seeking medical treatment for his hip.  However, he alleged that neither Defendants Sample nor Edmond responded to his attempts to obtain relief.  (*Id.* at 10, ¶ IV.44; Kinyon Decl. ¶ 3, Attach. 2 at 26.)  Plaintiff's request for an administrative remedy was denied on the ground that health-care staff at FCI-Sandstone had, in fact, responded to Plaintiff's informal requests.  (Kinyon Decl. ¶ 3, Attach. 2 at 27.)

In late 2009 and early 2010 Plaintiff continued to complain to medical staff at FCI-Sandstone about experiencing right-hip pain.  Defendant Dr. Paul Harvey evaluated Plaintiff for right-hip pain on July 28, 2009, and found that Plaintiff had a CT scan in 2008 that had been "abnormal, but not definitive."  (Doc. No. 21, Decl. of Paul T. Harvey ("Harvey Decl.") ¶ 2.)  Dr. Harvey ordered another CT

scan on August 26, 2009, and it again returned "abnormal," so Dr. Harvey referred Plaintiff to an orthopedic specialist.  (*Id.*)  Specifically, the August 2009 CT scan showed a 2.5 centimeter exostosis on the top of the right femur, indicating that Plaintiff had a probable osteochondroma.  (Pl.'s Aff., Attach. 3 at 12.)  On October 28, 2009, Dr. Momont, an orthopedic specialist, saw Plaintiff and indicated that Plaintiff experienced right hip pain and a probable osteochondroma, leading the orthopedist to recommend an "MRI to further evaluate the hip joint for any internal pathology as well as the boney lesion." (Harvey Decl. ¶ 2.)  Dr. Momont's notes from the evaluation confirm Dr. Harvey's assertions.  (Pl.'s Aff., Attach. 3 at 13.)  Plaintiff received the MRI on January 14, 2010, which showed "no abnormal bone marrow signal within the probable osteochondroma," and the area appeared "stable" when compared to the August 26, 2009 CT scan.  (Harvey Decl. ¶ 2.)  According to Dr. Harvey, "[t]he results of the MRI did not warrant a biopsy or any additional treatment . . . and the only recommendation was that Plaintiff have a followup [sic] MRI in 6 to 12 months." (*Id.*)  Again, Plaintiff's medical records confirm Dr. Harvey's assertions.  (Pl.'s Aff., Attach. 3 at 14.)

Defendants now seek to have the First Amended Complaint dismissed, or, in the alternative, to have this Court convert the motion to one for summary judgment based on the submission of factual matters outside the pleadings. (Doc. No. 12.)  Specifically, Defendants contend that Plaintiff's claims must be dismissed because: (1) this Court lacks personal jurisdiction over some of the

moving Defendants; (2) this Court lacks subject-matter jurisdiction over any official-capacity claims because of sovereign immunity; and (3) Plaintiff has failed to state a claim upon which relief can be granted.  (*See id.* (citing Fed. R. Civ. P. 12(b)(1), (b)(2), (b)(6)).)  Defendants also contend that they are entitled to summary judgment, that qualified immunity prevents Plaintiff's claims from going forward, and that Plaintiff failed to exhaust his administrative remedies on several of his claims.  (Doc. No. 14, Defs.' Mem. of Law in Supp. of Mot. to Dismiss or, in the Alternative, for Summ. J. ("Defs.' Mem.") 2.)

## DISCUSSION

## I.    Standard of Review

This Court begins with the observation that *pro se* complaints are held to less stringent standards than formal pleadings drafted by lawyers.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam).  However, even a *pro se* complaint must allege facts, and not just bare, unsupported, legal conclusions. *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) ("Although it is to be liberally construed, a pro se complaint must contain specific facts supporting its conclusions."); *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995) ("At the very least . . . the complaint must contain *facts* which state a claim as a matter of law and *must not be conclusory*.") (emphasis added).  "[I]n fulfilling its duty to liberally construe a civil-rights pleading," a court is not required to "divine the litigant's intent and create claims that are not clearly raised," nor is the court required to "read or construct an argument into a civil-rights pleading."  *Bediako*

*v. Stein Mart, Inc.*, 354 F.3d 835, 840 (8th Cir. 2004). Federal courts are not required to "assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint." *Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004).

As noted above, Defendants have moved for dismissal under Fed. R. Civ. P. 12(b)(6), or for summary judgment under Fed. R. Civ. P. 56. A civil complaint will be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a cause of action that will survive a Rule 12(b)(6) motion, a complaint must allege a set of historical facts, which, if proven true, would entitle the plaintiff to some legal redress against the named defendant(s) under some established legal theory. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980) (noting that "the complaint must allege facts, which if true, state a claim as a matter of law").

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).] A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

A motion to dismiss can be converted to a Rule 56 motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court" and all parties receive an opportunity to present material pertinent to the motion. Fed. R. Civ. P. 12(d). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Id.* at 255.

Here, Defendants have sought dismissal of Plaintiff's claims arising out of his medical treatment while he was confined at USP-Marion for lack of personal jurisdiction. As discussed below in Part II of this Report and Recommendation,

to address this argument, this Court need not convert Defendants' motion to dismiss for lack of personal jurisdiction into a motion for summary judgment. With respect to Plaintiff's claims arising out of his medical care while confined at FCI-Sandstone, Defendants have submitted materials outside the First Amended Complaint, and Plaintiff has provided evidentiary material in response to Defendants' motion. Because the parties have both submitted evidentiary material pertinent to the motion concerning medical care at FCI-Sandstone, this Court will convert this motion to one for summary judgment. *See* Fed. R. Civ. P. 12(d) ("All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."); *see also Becerra v. Symmes*, Civil No. 08-5358 (JMR/JJG), 2010 WL 489513, at \*2 (D. Minn. Feb. 4, 2010) (converting motion to dismiss to summary judgment where plaintiff had "ample notice that the defendants are seeking summary judgment").

## II. Lack of Personal Jurisdiction

Defendants first argue that this Court lacks personal jurisdiction regarding those Defendants who only had contact with Plaintiff while he was confined in Illinois and who were not involved in any events set forth in the First Amended Complaint that occurred in Minnesota. To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), a plaintiff must establish a *prima facie* case that the forum state has personal jurisdiction over the defendant. *See Stevens v. Redwing*, 146 F.3d 538, 543 (8th Cir. 1998). In the absence of an evidentiary hearing, a court "must look at facts

in the light most favorable to the nonmoving party and resolve all factual conflicts in favor of that party." *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991) (citations omitted). A federal court may assume jurisdiction over a nonresident defendant (such as some of the moving Defendants in this case), "only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause." *Romak USA, Inc. v. Rich*, 384 F.3d 979, 984 (8th Cir. 2004) (quotations omitted). Because the Minnesota long-arm statute "confers jurisdiction to the fullest extent permitted by the Due Process Clause," this Court need only consider due process requirements. *Coen v. Coen*, 509 F.3d 900, 905 (8th Cir. 2007) (citation omitted).

To satisfy due process, a defendant must have "sufficient minimum contacts" with the forum state such that maintaining the suit "does not offend traditional notions of fair play and substantial justice." *Romak*, 384 F.3d at 984. "Sufficient contacts exist when [a] defendant's conduct and connection with the forum state are such that [it] should reasonably anticipate being haled into court there." *Coen*, 509 F.3d at 905 (citation and quotation omitted). A defendant should reasonably anticipate being haled into court in a forum state within which it "purposefully avail[ed] [it]self of the privilege of conducting activities, . . . thus invoking the benefits and protections of [the state's] laws." *Id.* (citation omitted).

There are two types of personal jurisdiction, general and specific. "When a cause of action arises out of or is related to a defendant's contacts with the forum state, the exercise of personal jurisdiction is one of specific jurisdiction." *Epps v.*

*Stewart Info. Servs. Corp.*, 327 F.3d 642, 648 (8th Cir. 2003).  "However, if the exercise of jurisdiction does not depend on the relationship between the cause of action and the defendant's contacts with the forum state, the exercise of personal jurisdiction is one of general jurisdiction."  *Id.*  General jurisdiction exists when a defendant has "contacts with the state [that] are continuous and systematic."  *Id.*

Under either a general or specific personal-jurisdiction analysis, a court considers five factors to measure minimum contacts: "(1) the nature and quality of a defendant's contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties."  *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073-74 (8th Cir. 2004).  A court gives significant weight to the first three factors.  *See id.*

Here, Defendants Chastain, Castillo, Szoke, Bledsoe, Hollingsworth, and Davis (collectively the "USP-Marion Defendants") argue that this Court lacks personal jurisdiction over Plaintiff's claims against them because those claims do not relate to events that took place in the State of Minnesota, and none of the USP-Marion Defendants have had systematic and continuous minimum contacts with Minnesota.  In response, Plaintiff argues that for purposes of personal jurisdiction in this case "the relevant inquiry is whether the defendant has minimum contacts with the United States."  (Doc. No. 29, Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J. ("Pl.'s Mem.") 2.)  However, the cases and statutes Plaintiff cites do not support his argument

that the USP-Marion Defendants need not have sufficient minimum contacts with Minnesota for this Court to have personal jurisdiction over Plaintiff's *Bivens* claims against them.[5]

With the exception of Defendant Szoke, the USP-Marion Defendants have all filed declarations indicating that they have not had continuous or systematic contacts with the State of Minnesota.  (*See* Doc. Nos. 15-18, 22.)  Plaintiff's First Amended Complaint does not allege that Defendant Szoke had any continuous contacts with the State of Minnesota or that he took any actions that harmed Plaintiff in Minnesota.  There is no indication that any of the USP-Marion Defendants committed an act inside the State of Minnesota.  There is also no indication that any of the USP-Marion Defendants committed any act outside the State of Minnesota that caused injury to or property damages to Plaintiff while he was in the State of Minnesota.  All of the USP-Marion Defendants' contacts with

---

[5]    For instance, neither *Bd. of Trustees v. Elite Erectors, Inc.*, 212 F.3d 1031, 1035 (7th Cir. 2000), nor *In re Fed. Fountain Inc.*, 165 F.3d 600, 602 (8th Cir. 1999), have anything to do with personal jurisdiction over prison officials who have had no contacts with the forum state, and neither case stands for the proposition that they are subject to jurisdiction anywhere within the United States because Plaintiff has sued under a statute providing for nationwide service of process.  Similarly, Plaintiff's citation to 28 U.S.C. § 1391(e), which relates to the appropriate venue for actions brought against United States officials in their official capacity or against the United States itself, does not inform the issue whether prison officials from Illinois can be subject to the jurisdiction of the District of Minnesota without having any minimum contacts with the State of Minnesota.  *See Richards v. Fed. Bureau of Prisons*, Civil No. 06-3356(MJD/FLN), 2007 WL 2199108, at *7 (D. Minn. July 27, 2007) (rejecting prisoner's argument that venue was proper under § 1391(e) in response to issues of personal jurisdiction).

Plaintiff occurred in Illinois, while he was incarcerated at USP-Marion. And Plaintiff has made no *prima facie* evidentiary showing to establish that this Court has personal jurisdiction over any of the USP-Marion Defendants. For these reasons, this Court recommends that all claims against Defendants Chastain, Castillo, Szoke, Bledsoe, Hollingsworth, and Davis be dismissed. *See Dasta v. Shearin*, No. 04-4475 (MJD/RLE), 2007 WL 4952768, at *12-14 (D. Minn. Nov. 15 , 2007) (recommending dismissal of federal prisoner's claims against defendants from correctional facility in Maryland where such defendants had no contacts with the State of Minnesota related to prisoner's claims), *adopted as modified on other grounds by Dasta v. Shearin*, No. 04-4475 (MJD/RLE), 2008 WL 189953 (D. Minn. Jan. 22, 2008).

## II. Summary Judgment is Appropriate on Plaintiff's Deliberate-Indifference Claims from his Confinement at FCI-Sandstone

Defendants' motion for summary judgment should be granted with respect to all of Plaintiff's deliberate-indifference claims arising out of his medical care while he has been confined at FCI-Sandstone.[6] "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's ban on cruel and unusual punishments." *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009). Such claims have both an objective and subjective component, requiring

---

[6] Because this Court has concluded that Plaintiff's deliberate-indifference claims cannot survive summary judgment on the merits, this Court does not address Defendants' argument that Plaintiff has failed to exhaust his administrative remedies.

a plaintiff to show not only that he or she suffered from one or more objectively serious medical needs, but also that the prison officials actually knew of, but deliberately disregarded, such medical needs. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Under the objective component, a serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). Under the subjective component, the evidence must show that the prison officials recognized the existence of a substantial risk of harm and that they knew their conduct was inappropriate in light of that risk. *Gregoire v. Class*, 236 F.3d 413, 418 & n.3 (8th Cir. 2000). Notably, a difference of opinion between prison officials and the plaintiff regarding the appropriate course of treatment does not amount to a violation of the Eighth Amendment. *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). Further, "[d]eliberate indifference is akin to criminal recklessness, which demands more than mere negligent misconduct." *Popalii v. Correctional Med. Svcs.*, 512 F.3d 488, 499 (8th Cir. 2008).

Plaintiff has failed to present a triable issue on either the objective or subjective component of his deliberate-indifference claims. Concerning the subjective component, there is simply no evidence in the record to show that any Defendant knew of and deliberately disregarded Plaintiff's serious medical needs. At best, what Plaintiff has demonstrated is that he disagrees with the treatment decisions of his various health-care providers. The record further

demonstrates that Plaintiff has received significant treatment for his complaints regarding hemorrhoids and pain that he associates with his osteochondroma.

## A. Hemorrhoids

Plaintiff claims that during his incarceration at FCI-Sandstone, Defendants have deliberately disregarded his hemorrhoids specifically by (1) prescribing him the same medication for his hemorrhoids that he had received at USP-Marion prior to his transfer; and (2) indicating in May 2009, after being seen by Defendant Dr. Tom Nelson, that Plaintiff did not suffer from hemorrhoids. Summary judgment should be granted on both of these theories because, based on the evidence presented, when taken in the light most favorable to Plaintiff, no reasonable jury could conclude that Defendants recognized the existence of a substantial risk of harm and that they knew their conduct was inappropriate in light of that risk.

Plaintiff's disagreement with FCI-Sandstone's medical personnel concerning the medications he was provided for his hemorrhoid condition "does not provide the basis for a deliberate indifference claim." *Godfrey v. Warden Swift*, Civil Action Nos. 6:09cv61, 6:09cv82, 2009 WL 2047530, at *8 (E.D. Tex. July 10, 2009); *see also Nunley v. Mills*, No. 3:04-CV-2515-H, 2005 WL 483438, at *2 (N.D. Tex. Mar. 1, 2005) (finding that a disagreement of opinion between the plaintiff and physician on the correct medical treatment for a hemorrhoid condition was not enough to constitute an actionable deliberate-indifference claim). Here, the evidence indicates that upon his arrival at FCI-Sandstone,

Plaintiff received a one-time refill of the ointment and suppository medications he had previously been prescribed at USP-Marion. At that time, Nurse Vavrosky also advised Plaintiff that he would need to use the commissary to obtain over-the-counter medication for his hemorrhoids going forward. (Pl.'s Aff., Attach. 1 at 8-9.) The record also indicates that Plaintiff's complaints about his hemorrhoids did not go unaddressed, but that he was advised he needed to follow up with medical staff by submitting a sick-call request. (*Id.*, Attach. 4 at 21.) This is not a situation in which it appears that FCI-Sandstone staff was aware that Plaintiff had any adverse reaction to the medication he had been prescribed at USP-Marion, yet continued to provide the same treatment without considering an alternative. *Cf. Washington v. Lamour*, No. 07-4231-CV-C-SOW, 2008 WL 5082752, at \*2 (W.D. Mo. Nov. 25, 2008) (denying motion to dismiss where prisoner alleged he had a serious medical condition due to hemorrhoids and prison officials continued to provide him an adverse treatment despite knowledge of his adverse reactions and refused him alternative treatment). Rather, here, even viewed in the light most favorable to Plaintiff, the record indicates that FCI-Sandstone medical staff was responsive to Plaintiff's condition given the information they were provided.

Plaintiff further asserts that on March 24, 2009, he informed Defendant Edmond that he was suffering from pain related to his hemorrhoids, and that he had side effects from the medication he had been prescribed. However, on examination, Edmond did not find evidence of any hemorrhoids. Following that

visit, Edmond did not disregard Plaintiff's complaints, but referred Plaintiff to a surgeon, Defendant Dr. Tom Nelson. Dr. Nelson also did not find any evidence of hemorrhoids. Even viewed in the light most favorable to Plaintiff, at most these events could possibly suggest that these health care providers failed to identify Plaintiff's hemorrhoid condition, but thsi does not support a deliberate-indifference claim. *See Paige v. Holtzapple*, Civil Action No. 1:08-CV-0978, 2009 WL 2588849, at *5, 6 (M.D. Pa. Aug. 19, 2009) (noting that "a complaint that a physician or a medical department has been negligent in diagnosing or treating a medical condition does not state a claim of medical mistreatment under the Eighth Amendment" and concluding that a physician's "failure to examine or diagnose [a prisoner complaining of hemorrhoids] was not deliberately indifferent") (quotations omitted); *see also Godfrey*, 2009 WL 2047530, at *8 ("A claim that a doctor prescribed the wrong medication for hemorrhoids, at most, stated a claim for negligence, malpractice or disagreement with treatment, which will not support a finding of deliberate indifference under the Eighth Amendment."). For these reasons, summary judgment is appropriate on Plaintiff's deliberate-indifference claims arising from the care received at FCI-Sandstone for his hemorrhoid condition.

## B. Osteochondroma and Hip Pain

Plaintiff next claims that Defendants at FCI-Sandstone deliberately disregarded his serious medical needs by failing to provide him with a cure for his right-hip pain, which Plaintiff believes is associated with osteochondroma.

However, all of the objective medical evidence in the record suggests that the boney growth on Plaintiff's right femur, while diagnosed as a probable osteochondroma, is benign and stable, and that treatment beyond monitoring is unnecessary.  Notably, Dr. Momont, a physician who has seen Plaintiff for the osteochondroma and his complaints of hip pain, has indicated that the osteochondroma does not appear to be the origin of Plaintiff's pain.

There is also no evidence in the record that Plaintiff has requested and been denied any non-surgical treatment for his repeated complaints of hip pain.  The record shows that the medical staff at FCI-Sandstone has repeatedly ordered tests, X-rays, scans, and even a cortisone injection to address Plaintiff's complaints of hip pain, and it appears that Defendants have continuously monitored the osteochondroma.  Plaintiff's own submission of a printout from a University of Virginia Health System webpage relating to osteochondroma indicates that "[i]f there is no sign of bone weakening or increased overgrowth, observation only may be suggested."  (Pl.'s Aff., Attach. 3 at 3.)  Even taking these facts, and the inferences to be drawn from them, in the light most favorable to Plaintiff, no reasonable jury could conclude that Defendants have deliberately disregarded Plaintiff's serious medical needs.

Plaintiff has also not identified what specific medical procedure he believes (or that any physician has indicated) is required to treat the osteochondroma or his complaints of hip pain, although it appears he asked that the boney growth be removed in July 2009.  He appears to argue that the Ibuprofen FCI-Sandstone

medical staff recommended he use is insufficient to treat his pain.  Again, however, Plaintiff's disagreement with the course of treatment recommended by his doctors alone is insufficient to go forward with a deliberate-indifference claim. *See Estate of Rosenberg*, 56 F.3d at 37.  There is no objective medical evidence to suggest that Defendants' continued monitoring of the osteochondroma amounts to a deliberate disregard of Plaintiff's medical needs despite Defendants' awareness of a substantial risk to Plaintiff's health.  In fact, there is no objective medical indication that the osteochondroma presents any health risk at all.  And there is no objective medical evidence to suggest that Plaintiff's osteochondroma needs to be surgically removed.

Plaintiff also argues that various delays in the scheduling of the tests, X-rays, and CT scans related to his hip pain demonstrate Defendants' deliberate disregard for his medical needs.  However, delay in treatment is only actionable as a deliberate-indifference claim under the Eighth Amendment when there is some evidence that the physician knew that an inmate required medical attention.  *See Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862-64 (8th Cir. 2006) (concluding that prison officials violated inmate's Eighth Amendment rights by delaying medical care to an inmate despite their knowledge that inmate was at a high risk of heart failure).  In addition, "[a]n inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997).  Plaintiff has presented no

such evidence that would permit a reasonable jury to conclude that Defendants deliberately delayed testing and imaging his right hip despite being aware that such delay would injure Plaintiff. He has also presented no evidence that the delay actually led to a medically verifiable detrimental effect on his health.

There is also no evidence that Defendant Earl deliberately disregarded any medical condition by relocating Plaintiff to a new cell with a different bed. Plaintiff has not presented any objective medical evidence that he suffers from a condition that requires sleeping in a particular bed or on a particular kind of mattress. *See Kayser v. Caspari*, 16 F.3d 280, 281 & n.2 (8th Cir. 1994) (characterizing inmate's claim that his Eighth Amendment rights were violated by the confiscation of his egg-crate mattress as "frivolous" and noting that a physician's review of the inmate's medical records "determined that an egg-crate mattress was not medically indicated"); *Franklin v. McCaughtry*, 110 F. App'x 715, 721 (7th Cir. 2004) (concluding that inmate's deliberate-disregard claims relating to prison officials' denial of a "special mattress" for lower-back pain were unavailing because the inmate had failed to produce evidence that the special mattress was a serious medical need). Moreover, the evidence demonstrates that after Plaintiff complained of being moved to a bed with broken springs, he was provided with a serviceable bed frame on January 28, 2009. (Pl.'s Aff., Attach. 4 at 16-17.) FCI-Sandstone staff also addressed Plaintiff's later informal complaint about broken bed springs within a few days. (Pl.'s Aff., Attach. 5 at 6.) These facts would not permit a reasonable jury to conclude that Defendants

deliberately disregarded Plaintiff's serious medical needs.

## III.    Summary Judgment is Appropriate on Plaintiff's Retaliatory-Discipline Claim

Plaintiff appears to assert that Defendant Earl relocated him to a broken bed in retaliation for Plaintiff's filing of several grievances against FCI-Sandstone officials.[7] Thus, it appears that Plaintiff is asserting a retaliatory-discipline claim against Defendant Earl, which requires a showing that "(1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercise of the right was the motivation for the discipline." *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007).   "The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." *Haynes v. Stephenson*, 588 F.3d 1152, 1155-56 (8th Cir. 2009) (quotations omitted).  The Eighth Circuit has explicitly declined to decide whether relocation to a different cell constitutes "discipline" under the second element of a retaliatory-discipline claim.  *Id.* at 1156 ("We need not determine whether these sanctions [placement on Disciplinary Court Review status and transfers to different cells] constitute discipline[.]").  To show that "exercising the protected right motivated the discipline, an inmate must show that but for a

---

[7]    To the extent that Plaintiff claims that Defendant William Earl harassed him and threatened him in retaliation for having filed grievances against other prison officials at FCI-Sandstone, "[v]erbal threats are not constitutional violations" cognizable in a retaliation claim.  *See Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) (noting that verbal threats do not violate the constitution in the context of state prisoner's claims under 42 U.S.C. § 1983).

retaliatory motive the prison official would not have" taken the disciplinary action. *Id.* at 1156.  However, merely alleging that an act was retaliatory is insufficient. *See Benson v. Cady*, 761 F.2d 335, 342 (7th Cir. 1985).

Plaintiff states that Defendant Earl relocated Plaintiff to a cell with a bed that had five broken springs shortly after Plaintiff's hip pain was unsuccessfully treated by Dr. Momont through an injection.  Plaintiff asserts that he had informed Defendant Earl about his "medical condition" prior to the relocation. (Doc. No. 31, Pl.'s Aff. of Negative Averment ("Pl.'s Second Aff.") ¶ 4.)  But, Plaintiff has failed to present any evidence that Plaintiff's attempts to obtain medical care through his use of the grievance procedure motivated Defendant Earl's decision to relocate him to another cell or that Defendant Earl was even aware of the fact that the bed in the new cell had broken springs.  *See Johnson v. Steed*, Civil No. 6:06-cv-6009, 2008 WL 622808, at *5 (W.D. Ark. Mar. 4, 2008) (granting summary judgment on a prisoner's retaliation claim for being relocated to a more restrictive cell because prisoner "failed to show he was disciplined by" the move when the new cell did not have a television and there was no evidence to show that transfer was motivated by "impermissible motive").  Defendant Earl has presented affidavit testimony that he relocated Plaintiff to a different bunk for security reasons after he had seen Plaintiff glaring at the prison staff in Plaintiff's housing unit.  (Doc. No. 19, Decl. of William Earl ("Earl Aff.") ¶ 2.)  Plaintiff has not presented any evidence that Defendant Earl's assertion that the relocation occurred due to security concerns was some form of pretext.  Rather, Plaintiff

has merely alleged that the relocation was retaliatory, which is insufficient to survive summary judgment. *See Benson*, 761 F.2d at 342; *Beauclair v. Werholtz*, No. 07-3022-SAC, 2010 WL 1285449, at *4 (D. Kan. Mar. 31, 2010) ("[P]laintiff's bare and conclusory claim of retaliation [based on being moved to different cells and facilities] is insufficient to plausibly establish that but for plaintiff's grievances and lawsuits, any defendant's decision to relocate plaintiff or to issue a disciplinary report would have been different."). In this Court's view, summary judgment is appropriate on any retaliatory-discipline claim Plaintiff attempts to assert against Defendant Earl.[8]

## RECOMMENDATION

Based on the file, and all the records and proceedings therein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. No. 12), be **GRANTED**;

---

[8] Finally, this Court need not address Defendants' argument that this Court lacks subject-matter jurisdiction over plaintiff's official-capacity claims seeking damages because the moving Defendants are entitled to sovereign immunity on such claims. While the Complaint did not specify whether Plaintiff was suing Defendants in their official or individual capacities, his First Amended Complaint indicates that all Defendants are "being sued in their individual capacities." (FAC at 4.) Because this Court has concluded that Plaintiff's deliberate-disregard claims should not survive summary judgment, this alternative argument need not be addressed.

2.    Plaintiff's claims against Defendants M. Chastain, Fernando Castillo,

David Szoke, B. A. Bledsoe, Lisa Hollingsworth, and Brian Joe Davis be

**DISMISSED WITHOUT PREJUDICE**;

3.    Plaintiff's claims against Defendants Mr. Kenneth Sample, James

Edmond, Dr. Paul Harvey, Tom Nelson, Scott Fisher, Lanett Ritter, and William

Bill Earl, be **DISMISSED WITH PREJUDICE**; and

4.    This case be **DISMISSED IN ITS ENTIRETY**.


Date: April 28, 2010

_s/ Jeffrey J. Keyes_
JEFFREY J. KEYES
United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **May 12, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.